Good morning, Your Honors. Mr. Ezra White. Yes, good morning, Your Honors. If it pleases the Court, I am Yehuda Judd Azulay on behalf of Mr. Sembhi. I'll be very brief. This case has some unusual circumstances. The most unusual circumstances is that we're now here on the appeal on the fifth motion to reopen. Now, I want to bring the Court... Under Monteview Lynch 135, Supreme Court 2150, a 2015 case, the Supreme Court's held that the courts of appeals have jurisdiction to review immigration claims that have been rejected pursuant to the statutory requirements for a motion to reopen. And the reason for the denial makes no... At 2154-55, the Supreme Court stated that the reason for the denial makes no difference to the jurisdictional issues. I realize that we've got a very high burden. The courts have ruled numerous times that review of motions to reopen have a very high burden. Motions to reopen are disfavored, especially in removal proceedings. Basically said by Supreme Court in Inez V. Doherty, 502 U.S. 314, 1992. A motion to reopen, though, does require that the evidence be new material and unavailable when the order was entered. We now have, but in combined, our motion to reopen relies upon Lozada. And I want to bring to the Court's attention a case just from this past week, I believe, in the 11th Circuit, Lynn v. USA Attorney General, number 17-10834, basically discussing a different fact situation, but discussing multiple motion to reopens and the requirements. Page 17 of the 28-page decision relies on that. And we've got an action here that relates to the last denial of a motion to reopen, which included and amplified all prior motions to reopen. The Court does have the jurisdiction. We've argued all along that the BIA abuses discretion in this matter, and the byword is discretion. While motions to reopen are discretionary and the BIA has wide, broad discretion on the same, there has to be the application of legal principles, must be adhered to, and failure to do the same is what's reviewable. Now, real quickly, and I'm going to just about end my argument, this appeal rises from multiple issues with Lozada. And the real question that we're raising for the first time is, when does the attorney-client relationship rise and is established under Lozada? Does it arise when a client pays the attorney and goes through the process, or multiple consultations where the advice is incorrect, does that bring it to the level of Lozada? We believe it does, especially when the information provided in those consultations led to a ten-year hiatus between the time, the first time that he came to see the attorney to when he was told that, like the old contract in school where you swim across a river and when you reach the end of the river, the person says, revoke bones, revoke. We're in that situation, and what I have to point out is that I believe that Lozada rises with the consultation, and an analogy may be in a divorce situation where a party goes and interviews half a dozen different attorneys that the other spouse can't use them in a case. And I believe that's what happens in Lozada. The minute you consult with somebody, you've established an attorney-client relationship, and the advice provided is what's important there. Let me just, one more thing. As we know that this case arose years before by the failure to attend a hearing, I have to point out that historically in this case, prior to the in absentia order where he failed to attend that hearing, there have been numerous other cases where he appeared each and every time, came to the attorney's office, went with him to court. In this instance, two days prior to him appearing, the attorney had appeared. My gut reaction is that when he did appear and he was told, too late, you've been ordered and deported, a motion to reopen should have been filed at that immediate point in time saying, look, we've had a process. He's been here 10 times before. Unfortunately, he had the wrong date in his calendar. He had to come up from southern Wisconsin to Chicago, and whatever the reasons are, we miscommunicated. The attorney should have fell on his sword for that action. Nothing like that happened, and that's why we're here today, because we believe that Mr. Sembe is entitled to his day in court. He does have relief available. He's got a U.S. citizen wife and two children, yes, thereafter acquired equities, but the bottom line is that had things been right with him on day one, we wouldn't be in this situation. Thank you. Thank you, Counsel. Mr. Stewart. Thank you, Your Honor. Scott Stewart on behalf of the Attorney General. I'm happy, Your Honor, to rest on the briefs to a large extent. We walked through a number of reasons why the BIA did not abuse its discretion, but I do want to make sure I just hit two points very quickly. First, Your Honor, just on the exercise of discretion here, there was a good reason for the BIA to exercise its discretion not to by enforcing the compliance with Lozado, because despite repeated warnings, continued motions now, continued facts of notice, Mr. Sembe has been put on clear notice that he needed to give notice to his prior counsel. We still don't have an indication that he's given notice to all of the counsel whose performance he's attacked. We do have one response from Ms. Lenz-Calvo, but still we don't know what was necessarily brought to her attention, whether Ms. Lenz-Calvo was fully notified of all of the charges. So, again, we don't have that critical Lozado notification requirement that this Court has emphasized in cases like Patel and other matters. If the record shows that one or more of the attorneys Mr. Sembe has charged with ineffectiveness received notice of his ARDC complaints and thus had the opportunity to respond, then wouldn't that constitute substantial compliance with Lozado? I'm not sure. I agree it would certainly hit the notification requirement better than it has been, Your Honor. At least the only one we have that to, of course, is Ms. Lenz-Calvo. And the only recent evidence we have is that there may be a problem on the first prong about just the scope or the existence and scope of any representation. But the problem we have here is that we still don't have an indication that attorneys Burton and Carbide got notice and were able to respond to these allegations. I mean, Burton in particular would have been useful to have him give an opportunity to respond about what happened back when. But on that point about just the appearance or non-appearance at the hearing, and I'm happy to close by noting this, Your Honor, is that I just want to note that Mr. Sembe, in contrast to the petitioner in Singh, and I believe the petitioner in the Bonilla BIA decision cited in the petitioner's brief, Mr. Sembe had much more reason not to attend his October hearing. We know from the kind of mid-2001, the July 5, 2001 hearing, that things were not going well for his request for relief. It was around that time where it became clear that Mr. Sembe's first marriage was either dissolving or, you know, had at that time a divorce had been granted. There were concessions thereabouts that he couldn't at that time pursue adjustment of status. He'd not been pursuing asylum. And he was instead going for potentially cancellation of removal as a battered spouse. And there were strong indications that he didn't have a good ground for relief, and therefore did not have a, you know, the same sort of incentive to show up at his October hearing. So in other words, what you're saying is that from the government's perspective, Mr. Sembe did not have a potentially meritorious basis on which to oppose removal in October 2001? I'd say the way I'd phrase it, Your Honor, is that we have, based on the record we have, we have reasonably good indications that the main basis on which he had been seeking relief had disappeared. And we don't know much about the strength of the other grounds of relief because he never filed for them, so far as I believe the record discloses, I believe the battered spouse relief. And he gave up an asylum application. So, so far as the record discloses, he really didn't have much of a claim left, at least so far as we've been able to tell. And if there are no further questions, I'll press on the briefs. It appears there are none. Thank you, Mr. Stewart. Thank you, Your Honor. Mr. Rousselet, anything further? I think it's important to clear the record for one minute. The appearance in court, at worst, at worst, he would never have gotten a deportation order. He would have gotten a voluntary departure order, and he did have claims for relief. That would have been addressed at that point in front of the IJ. It was never an intentional attempt to avoid it. Somebody who'd appeared in court ten times previously and driven down, rain, sleet, shine, or snow, he'd been there every other time before. And the notification that was addressed by the government's attorney, I must admit that all the attorneys were notified. The responses came from all the attorneys. They were all notified either individually or through the ARDC. There was never a failure in any prong under Lizada in this case. Thank you, Your Honor. Thank you very much. The case is taken under advisement, and the court will be in recess.